**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Merit Homes, LLC,<br><br>           Plaintiff,<br><br>vs.<br><br>Joseph Carl Homes, LLC, et al.,<br><br>           Defendants. | No. CV-10-2030-PHX-SMM<br><br>**MEMORANDUM OF DECISION<br>AND ORDER** |

Plaintiff Merit Homes LLC ("Merit Homes" or "Merit") brought this civil action complaint against Defendants Joseph Carl Homes and Joseph Carl Mulac (collectively "JCH") alleging copyright infringement, unjust enrichment, and tortious interference with contract. (Doc. 1.) Merit alleges that JCH infringed upon their copyrights in four residential tract home designs, unjustly enriching themselves with Merit's intellectual property and tortiously interfering with Merit's contract with its architect, the Felten Group ("Felten"), by improperly inducing Felten to breach its contract with Merit. (Id.) Pending before the Court are the parties' cross motions for summary judgment. (Docs. 33, 34, 38-45.) The Court will grant JCH's motion for summary judgment on the copyright infringement claim and will not exercise its discretion to retain supplemental jurisdiction regarding Merit's unjust enrichment and tortious interference with contract claims. Further, the Court will deny Merit's motion for summary judgment.

**BACKGROUND**

Merit Homes is an Arizona home builder. In December 2006, Merit Homes and

1 Winters Arboleda Ranch Investment were the two members of Arboleda Ranch, LLC
2 ("Arboleda Ranch"), a residential home development company planning a residential home
3 development at 28th Street and Baseline in Phoenix, Arizona. (Doc 34 at 1, 34-2 at 6.) It
4 is undisputed that Arboleda Ranch and/or Merit Homes entered into the following contracts
5 in order to finance and develop the residential home development project.

6 On December 15, 2006, Arboleda Ranch signed a $13,975,000 Construction Loan
7 Agreement with National Bank of Arizona ("NBA") in order to finance the residential home
8 development project. (Doc. 34 at 1; 34-2 at 9-75.) Prior to NBA disbursing construction
9 loan monies, Arboleda Ranch was obligated to furnish NBA with plans and specifications
10 for "construction of the Buildings and Residences." (Doc. 34-2 at 32.)

11 In the event of loan default, the contract provided that NBA had the right to take over
12 and complete construction of the residential home development. (Id. at 62.) Upon default,
13 Arboleda Ranch was required to "collaterally" transfer[] and assign[] to NBA all of their
14 right, title and interest in the plans and specifications. (Id.)

15 Lender may use the Plans and Specifications for any purpose relating to the
improvements, including, but not limited to inspections of construction and the
16 completion of the improvements.

17 (Id.) "This assignment shall inure to the benefit of the Lender, its successors and assigns. .
18 . ." (Id.) The loan documents do not require foreclosure prior to the exercise of this contract
19 right.

20 In conjunction with its signing of the Construction Loan Agreement, on December 15,
21 2006, Arboleda Ranch, as Trustor, entered into a Construction Deed of Trust with NBA as
22 the Trustee and Beneficiary. (Doc. 34 at 2; 34-3 at 2-44.) As beneficiary, NBA was granted
23 a security interest in "all present and future licenses, permits, approvals" and "all present and
24 future plans, specifications, [and] drawings." (Doc. 34-3 at 3.) Upon default, the Beneficiary
25 and "Beneficiary's successors and assigns" were entitled to use "the plans and specifications
26 . . . in the actual construction of the improvements" as "approved" by the appropriate
27 authorities. (Id. at 15-16.) NBA perfected a security interest in the plans and permits for the
28

Arboleda Ranch Project. (Id. at 45-49.) A UCC Financing Statement was filed covering all "plans and specifications for the improvements" and "permits." (Id.)

On December 15, 2006, Arboleda Ranch also entered into a Construction and Project Managment Agreement with MH Construction, LLC. (Doc. 34 at 3; Doc. 34-3 at 51-57.) Merit Homes was the only member of MH Construction, LLC. (Doc. 34 at 3; Doc. 34-3 at 59-60.) MH Construction, LLC agreed to complete construction of the residential home development project in accordance with "ARL [Arboleda Ranch] approved Construction Drawings." (Doc. 34 at 3; 34-3 at 51.) The manager of MH Construction characterized the Construction and Project Management Agreement as a license from Merit Homes to MH Construction to use approved construction drawings. (Doc. 34-4 at 16-17.) Arboleda Ranch further warranted to NBA that "all rights, title and interest of any predecessor with respect to the Plans and Specifications have been duly assigned and transferred to" Arboleda Ranch. (See Doc. 34-2 at 32, 62.) Thus, Arboleda Ranch was licensed to use approved schematic designs and construction documents to complete the residential home project.

On February 2, 2007, Merit Homes contracted with the Felten Group for Felten to provide schematic design and construction documents for the residential home development project at Arboleda Ranch. (Doc. 1-1 at 2-8.) The contract provided that after delivery of the design and construction documents to Merit, Felten would retain "an ownership and property interest (including the copyright) in such documents, whether or not the Project is completed." (Doc. 34-2 at 5.) Felten agreed not to "reuse and/or present the design documents to any other entity or business without written consent from the client." (Id.) Merit did not fully compensate Felten for the services Felten provided for the Arboleda Ranch project. (Doc. 34-5 at 2.) Merit concedes that it still owes Felten approximately $78,000 for preparing construction drawings for Arboleda Ranch. (Id.; see also Doc. 38 at 12-13.) Arboleda Ranch used the Felten Group construction drawings to obtain building permits from the City of Phoenix for the Arboleda Ranch Project, and to build three model homes. (Doc. 34-4 at 5-6, 18-19.)

- 3 -

Arboleda Ranch, and Merit Homes as guarantor, defaulted in making its loan payments to NBA. (Doc. 1 at 3; 34 at 4; 34-5 at 14; 34-3 at 2-44.) The Deed of Trust provided that "each of the entities, if any, comprising Trustor shall be jointly and severally liable for the obligation(s) arising under this Deed of Trust." (Doc. 34-3 at 34.) On August 21, 2008, the Trustee gave notice of a Trustee's sale. (Doc. 34 at 4; 34-5 at 26-29.) On October 22, 2008, NBA filed a foreclosure action against Arboleda Ranch in state court. (Doc. 34-5 at 14, 31.) The state court appointed a Receiver to take possession of the real property and "all present and future licenses, permits, approvals and agreements thereon; all present and future plans, specifications, drawings . . . relating to the Real Property" and other categories of property (collectively the Collateral). (Doc. 34 at 4; 34-5 at 31-38.) Arboleda Ranch was ordered to turn over all "licenses, permits or governmental approvals relating to the Real Property or Collateral" and "all documents pertaining to past, present or future construction. . . ." (Doc. 34-5 at 36-37.)

On November 21, 2008, the Receiver took possession of the building plans and permits. (Doc. 34-4 at 7.) The Receiver conducted a Trustee Sale regarding the real property and collateral:

> On or about November 21, 2008, NBA conducted a Trustee Sale with regard to the Real Property and Collateral, as those terms are defined in the Receivership order, located in Maricopa County Arizona. NBA was the highest bidder at the Trustee Sale and acquired the Real Property and Collateral for a credit bid in the amount of $3,936,000.00 (the "Sale Price").
>
> Accordingly, or about November 21, 2008 NBA completed a valid foreclosure sale of the Real Property and Collateral. . . .

(Doc. 34-5 at 45.) Because NBA was the successful bidder at the Trustee's Sale, the Receiver was ordered to relinquish control of the real property and collateral to NBA. (Id. at 37.) The contract documents provided that NBA had the right to "use the plans" to complete construction of the residential development, or to authorize a successor-in-interest to do so. (Doc. 34-3 at 15, 34-2 at 20, 61-62.)

It is undisputed that on January 6, 2009, NBA entered into a Purchase and Sale Agreement for the real property and certain personal property, including "subdivision

- 4 -

1    improvement plans [and] house plans" for $2,225,000. (Doc. 34-6 at 2-14.) The Buyer, Brimet II, LLC, entered into an Addendum designating it as Arboleda Ranch 31, LLC. (Id. at 14.)

After NBA had sold the residential home plans to Arboleda Ranch 31, LLC, on February 26, 2009, the parties to the state court foreclosure action, including Merit and NBA, entered into a Settlement and Mutual Release Agreement. (Doc. 34-5 at 14-24.) Under the terms of the settlement agreement, the parties mutually released and settled all claims that could have been brought under the terms of the loan documents, and that "all prior agreements and understandings of the Parties are superseded." (Id. at 16, 17.) Under the settlement agreement, Merit Homes was required to provide a financial statement that "accurately disclosed, among other things, all of Obligors' assets and liabilities." (Id. at 15.) Merit did not reference any plans, specifications, or copyright ownership regarding the Arboleda Ranch Project in the financial statement it submitted to NBA. (Id.)

It is undisputed that on June 2, 2009, Arboleda Ranch 31, LLC and JCH entered into a Lease and Option to Purchase Agreement for the residential home project which provided: "Seller shall transfer all of its rights, if any, to the building plans to the Buyer during the term of this Agreement." (Doc. 34-6 at 40.) As part of the purchase agreement, Arboleda Ranch 31 provided the building plans to JCH. (Id. at 50-51.) On July 2, 2009, the Felten Group additionally contracted with JCH authorizing JCH to use the residential development plans for a total fee of $76,000. (Id. at 60-62.)

On March 26, 2010, Merit filed and obtained copyright registration of the residential floor plans. (See Complaint Ex. D (Doc. 2-1). Merit Homes claimed joint authorship (with the Felten Group) of the schematic design documents (elevations and residential floor plans).[1] (Id.) Merit then filed this Complaint, in part alleging that JCH infringed their

---

[1] As a general rule, the author of a copyright is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection. See Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737

- 5 -

1  copyright in the residential home plans.

## STANDARD OF REVIEW

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323-24. The party opposing summary judgment need not produce evidence "in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324. However, the nonmovant "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co.,

---

(1989). For the purpose of moving for summary judgment, JCH took the position that Merit and Felten were joint authors of the copyrighted residential home plans. (See Doc. 33 at 8.) For the purpose of resolving these cross-motions for summary judgment, the Court also takes the position that Merit and Felten are joint authors of the copyrighted plans.

1  Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986); Brinson v. Linda Rose Joint
2  Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

3  Regarding contract construction, in Arizona, a court will attempt to enforce a contract
4  according to the parties' intent. See Taylor v. State Farm Mut. Auto. Ins. Co., 175 Ariz. 148,
5  152-53, 854 P.2d 1134, 1138-39 (1993). In doing so, "[a] contract should be read in light of
6  the parties' intentions as reflected by their language and in view of all the circumstances."
7  Smith v. Melson, Inc., 135 Ariz. 119, 121-22, 659 P.2d 1264, 1266-67 (1983).

**DISCUSSION**

Copyright Infringement

10  It is well established that architectural plans and drawings are entitled to copyright
11  protection under the Federal Copyright Act. 17 U.S.C. § 101 *et seq*. Section § 101
12  specifically defines an "architectural work" as "the design of a building as embodied in any
13  tangible medium of expression, including a building, architectural plans, or drawings." Id.,
14  § 101. Under the Copyright Act, the copyright owner has several exclusive rights, including
15  the rights to reproduce, prepare derivative works based upon, and distribute copies of the
16  copyrighted work. Id., § 106. Section 501 of the Act provides that "[a]nyone who violates
17  any of the exclusive rights of the copyright owner as provided by section[] 106 . . . is an
18  infringer of the copyright[.]" Id., § 501(a). To establish direct infringement, copyright
19  plaintiffs must satisfy two requirements: 1) they must show that they own the allegedly
20  infringed copyright, and 2) they must show that the alleged infringer has violated at least one
21  of the exclusive rights granted under section 106. See A&M Records, Inc. v. Napster, Inc.,
22  239 F.3d 1004, 1013 (9th Cir. 2001). If the copyright infringement dispute turns on whether
23  there is a license, the burden is on the alleged infringer to prove the existence of the license.
24  See Tasini v. New York Times Co., 206 F.3d 161, 171 (2nd Cir. 2000).

25  Merit argues that JCH directly infringed its copyright by making and inducing others
26  to make unauthorized copies, unauthorized derivative works, and engaging in unauthorized
27  distribution of its architectural designs. (Doc. 41 at 6.) JCH contends that their use of the

- 7 -

1 residential development plans did not infringe upon any of Merit's exclusive rights as a joint
2 owner of the copyrighted plans because JCH had a valid license to use the plans to complete
3 the Arboleda Ranch Project. (Id.)

4 The Court agrees with JCH. The Court finds that JCH obtained Arboleda Ranch's
5 implied license to use the plans to complete the residential home project. See Asset
6 Mktg.Sys., Inc. v. Gagnon, 542 F.3d 748, 754-57 (9th Cir. 2008); I.A.E., Inc. v. Shaver, 74
7 F.3d 768, 775 (7th Cir. 1996); Effects Assoc., Inc. v. Cohen, 908 F.2d 555, 556 (9th Cir.
8 1990). Under the Construction Loan Agreement, the Construction Deed of Trust and the
9 Construction and Project Management Agreement, Merit understood and accepted that
10 Arboleda Ranch had a license to use the plans to: (1) obtain City of Phoenix approvals and
11 building permits; (2) approve construction drawings; (3) hire subcontractors and build model
12 homes; (4) market the Arboleda Ranch project; and (5) obtain NBA's approvals and loan
13 disbursements in the form of payment to Arboleda Ranch and MH Construction, LLC. Merit
14 also knew that the loan documents repeatedly represented that if Arboleda Ranch defaulted
15 on the loan, a subsequent purchaser could use the residential home plans to complete the
16 project. When Arboleda Ranch defaulted on the loan, NBA succeeded to Arboleda Ranch's
17 license under the terms of the loan documents and, ultimately, the license was sold to JCH
18 to complete the Arboleda Ranch project. Thus, as more fully discussed below, the Court
19 finds that JCH's use of the plans to complete the Arboleda Ranch project was not copyright
20 infringement but authorized by its license. Therefore, the Court need not discuss the other
21 defenses that JCH raises against Merit's allegations of copyright infringement.

22 While a copyright owner can sell or license his rights to someone else, the Copyright
23 Act invalidates a purported transfer of copyright ownership unless it is in writing. See 17
24 U.S.C. § 204(a); Effects, 908 F.2d at 556. A transfer of copyright ownership is defined as
25 "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or
26 hypothecation of a copyright or of any of the exclusive rights comprised in a copyright,
27 whether or not it is limited in time or place of effect, but not including a nonexclusive
28

1 license." 17 U.S.C. § 101.  The transfer of copyright ownership definition expressly
2 excludes the granting of a nonexclusive license, which need not be in writing. Id.; see also
3 Effects, 908 F.2d at 556.  In fact, each owner or co-owner of a copyright has the right to use
4 or to *license the use* of the copyright.  See Oddo v. Ries, 743 F.2d 630, 633 (9th Cir. 1984)
5 (emphasis added).  The acquiring of a license creates an affirmative defense to a claim of
6 copyright infringement. Effects, 908 F.2d at 559.

7       The granting of a nonexclusive license need not be in writing and may be valid although
8 oral or implied from conduct between the parties, that is, whether the copyright owner's
9 conduct manifested an intent to grant a license.  See Foad Consulting Group, Inc. v. Musil
10 Govan Azzalino, 270 F.3d 821, 826 (9th Cir. 2001).  Arizona recognizes implied contracts.[2]
11 Arizona Bd. of Regents v. York Refrigeration Co., 115 Ariz. 338, 341, 565 P.2d 518, 521
12 (1977).  "An implied contract is one not created or evidenced by explicit agreement, but
13 inferred by the law as a matter of reason and justice from the acts and conduct of the parties
14 and circumstances surrounding their transaction."  Carroll v. Lee, 148 Ariz. 10, 13, 712 P.2d
15 923, 926 (1986).

16       In considering whether the copyright owner's conduct manifested an intent to grant a
17 license, the relevant intent is the licensor's objective intent at the time of the creation and
18 delivery of the plans as manifested by the parties' conduct.  See Asset Mktg, 542 F.3d at 756.
19 The Ninth Circuit holds that an implied nonexclusive license is granted when, 1) a person
20 (the licensee) requests creation of a work, 2) the creator (the licensor) makes that particular
21 work and delivers it to the licensee who requested it, and 3) the licensor intends that the
22 licensee-requestor copy and distribute his work independent of the creator's involvement.
23 See id. at 755; Effects, 908 F.2d at 558.  If supported by consideration a nonexclusive license
24 is irrevocable.  Asset Mktg, 542 F.3d at 757.

---

[2]Generally, courts rely on state law to fill in the gaps that Congress leaves in federal statutes.  Foad, 270 F.3d at 827 (citation omitted).  Thus, where the Copyright Act does not address an issue, courts turn to state law to resolve the matter, so long as state law does not otherwise conflict with the Copyright Act.  Id. (citations omitted).

- 9 -

1     <u>Creation</u>

2     Merit, acting on behalf of Arboleda Ranch, requested and contracted with Felten for 3 Felten to create schematic design and construction documents for the Arboleda Ranch 4 Project. (Doc. 1-1 at 2-8.)

5     <u>Delivery</u>

6     Felten created and delivered the schematic designs and the construction documents to 7 Arboleda Ranch. (Doc. 34-4 at 25-44.) The schematic designs and construction documents 8 that Felten created were specifically prepared for the Arboleda Ranch project. (<u>Id.</u>, Doc. 1-1 9 at 2-8.) Merit paid Felten for its work in creating the schematic design documents, but did 10 not fully compensate Felten for production of the construction documents for the Arboleda 11 Ranch project. (Doc. 34-5 at 2; Doc. 39-2 at 15.)

12     <u>Copying and Distribution</u>

13     Felten intended that Arboleda Ranch would copy and distribute its schematic designs 14 and construction documents to all necessary parties so that the residential home development 15 could be approved, permitted, and built. Specifically, the Construction Loan Agreement 16 required that Arboleda Ranch obtain NBA's approval regarding use of the plans to develop 17 the lots and model homes at the project. (Doc. 34-2 at 32.) Arboleda Ranch also had the 18 duty to copy and submit the plans to the City of Phoenix to obtain approval and necessary 19 building permits. (Doc. 34-4 at 5-6, 18-19; 34-3 at 3, 45-49.) The Felten plans were also 20 copied and used in the sales materials for marketing the residential home project. Thus, it 21 is clear at the time of the creation and delivery of the plans that Felten intended that Arboleda 22 Ranch, independent of Felten's continuing involvement, would do all things necessary with 23 the plans so that the residential home development could be approved, permitted, and built. 24 There is no provision in the Felten-Merit contract which requires the architect's express 25 permission to use Felten's plans if Felten is no longer involved in the project. See <u>Nelson-</u> 26 <u>Salabes, Inc. v. Morningside Dev., LLC.</u>, 284 F.3d 505, 515 (4th Cir. 2002) (architect's 27 contractual provision expressly required his permission to continue to use his plans if he was

28

- 10 -

1   no longer to be involved in the project).

2   It is also clear that at the time of the creation and delivery of the plans, the objective
3   intent of Merit was to license Arboleda Ranch to do all things necessary with the plans so
4   that the residential home development would be approved, permitted, and built to
5   completion. See Foad, 270 F.3d at 829 (granting implied nonexclusive license to complete
6   the building project). Merit also knew that the loan documents repeatedly represented that
7   if Arboleda Ranch defaulted on the loan, a subsequent purchaser was entitled to use the
8   residential home plans to complete the project. Merit Homes' undisclosed intent to bar a
9   subsequent purchaser from completing the Arboleda Ranch project despite acknowledged
10  default is contrary to the express terms of the loan contracts and barred by the Parol Evidence
11  Rule. See, e.g., Taylor, 175 Ariz. at 152-53, 854 P.2d at 1138-39 (parol evidence cannot
12  vary or contradict the written agreement); see also Asset Mktg, 542 F.3d at 757 (finding that
13  after a computer programmer's contract for services had been terminated, his statement that
14  the programs he developed for the company's use could no longer be used after his departure
15  was not sufficient to negate all other objective manifestations of intent to grant the company
16  an unlimited license at the time he created and delivered the programs).

17  Consideration

18  If supported by consideration a nonexclusive license is irrevocable. Id. at 757. A
19  nonexclusive license supported by consideration is a contract. Id. Consideration was
20  received by Arboleda Ranch. All of the loan documentation represented that the plans were
21  part of the collateral for the loan that Arboleda Ranch received from NBA. The plans then
22  could be used by Arboleda Ranch, NBA, or successors-in-interest to complete the residential
23  home project.

24  Scope of the License

25  JCH used the schematic design and construction documents within the scope of the
26  nonexclusive implied license that it ultimately obtained from Arboleda Ranch 31 to complete
27  the Arboleda Ranch project. All of the loan documents corroborate the mutual intent of
28

- 11 -

1 Arboleda Ranch and NBA, that in the event of default, NBA or successors-in-interest could
2 use the plans to complete the project. Based on the loan documents, Arboleda Ranch's
3 license ultimately passed from NBA to JCH to use the plans to complete the residential home
4 project.

<u>Merit's Contentions–Plans Were Not Foreclosed</u>

6 Merit admits that NBA had a security interest in the plans and does not dispute that the
7 state court Receiver took possession of the plans after Arboleda Ranch defaulted on its loan
8 obligations. (Doc. 38 at 2.) However, Merit contends that NBA did not foreclose on the
9 plans and the transfer of possession of the plans to the Receiver does not constitute
10 foreclosure. (<u>Id.</u>; Doc. 45 at 7 (arguing that NBA's foreclosure action did not include the
11 residential home plans and therefore did not extinguish its right to control the use of the
12 copyrighted plans.) At the trustee's sale, Merit argues that NBA only foreclosed against the
13 real property. (Doc. 45 at 7.) Subsequently, the parties to the foreclosure action signed a
14 "Settlement and Mutual Release Agreement." (Doc. 34-5 at 14-24.) Merit contends that the
15 settlement agreement confirms that one hundred percent of NBA's "credit bid" to buy the
16 "real property and collateral" was allocated only to the real property. (Doc. 45 at 7, citing
17 Doc. 34-5 at 14.) Consequently, NBA did not obtain a right to use the home plans; rather,
18 Merit retained its full bundle of co-ownership rights in the residential home plans post-
19 foreclosure. (Doc. 45 at 8.)

20 The Court disagrees. The loan documents do not require foreclosure proceedings to
21 exercise contract rights. Upon default, the loan documents "collaterally" transferred and
22 assigned to NBA all right, title and interest to the plans and specifications, and the
23 assignment inured to the benefit of successors and assigns. (Doc. 34-2 at 32, 61-62, Doc. 34-
24 3 at 15-16.) The loan documents do authorize NBA's "successors and assigns" to use the
25 plans to complete construction of the project. (<u>Id.</u>)

26 During the foreclosure proceedings, the state court Receiver was ordered to take
27 possession of the building plans and permits. (Doc. 34-4 at 7.) The Receiver then conducted

1  a Trustee Sale regarding the real property and collateral, which included the building plans
2  and permits. (Doc. 34-5 at 45.) Following the Trustee Sale, the Receiver was ordered to
3  relinquish control of the real property and collateral to NBA as the successful bidder. (Id.
4  at 37.) The plans were provided to NBA as part of the collateral and NBA took possession
5  of the plans as authorized by the loan documents. The loan documents further provided that
6  NBA was authorized to "use the plans" to complete construction of the residential
7  development, or to authorize a successor-in-interest to do so. (Doc. 34-3 at 15, 34-2 at 20,
8  61-62.) Subsequently, NBA sold the real property and certain personal property, including
9  "subdivision improvement plans [and] house plans" to Arboleda Ranch 31. (Doc. 34-6 at
10 13.)

11 The settlement agreement between NBA, Arboleda Ranch and Merit, which was entered
12 into after NBA had already sold the plans to Arboleda Ranch 31, recites a valid Deed of
13 Trust sale of the "Real Property and Collateral." (Doc. 34-5 at 14.) Thus, the Court does not
14 agree with Merit that NBA was not authorized to use the home plans to complete the project.
15 NBA and its successors had a valid license to use the residential home plans to complete the
16 project. JCH's right to complete the construction of homes in the Arboleda Ranch Project is
17 within the scope of the rights assigned to NBA and ultimately sold to JCH. The Court has
18 already found that JCH acquired from Arboleda Ranch 31 an implied nonexclusive
19 irrevocable license to complete the residential home project. JCH's implied nonexclusive
20 irrevocable license is an affirmative defense to Merit's copyright infringement allegations
21 against JCH's use of the plans to complete the project. See Effects, 908 F.2d at 559.

22  <u>Merit's Contentions–Nonexclusive License</u>

23 The Court found that Arboleda Ranch had an implied nonexclusive irrevocable license
24 to see the project approved, permitted, and built to completion. Even given Arboleda
25 Ranch's license, Merit still argues that the subsequent settlement agreement superseded and
26 discharged prior agreements within its scope and therefore the settlement agreement
27 discharged the implied nonexclusive irrevocable license that Arboleda Ranch 31 sold to JCH.
28

- 13 -

1  (See Doc. 45 at 8 (arguing that the settlement agreement discharged all security interests
2  except the real property and discharged all prior collateral claims). In support, Merit cites
3  Rogers v. American President Lines, Ltd., 291 F.2d 740, 742 (9th Cir. 1961), for the
4  proposition that the implied nonexclusive irrevocable license contract is unenforceable
5  because a valid express settlement agreement covers the same subject matter, rendering the
6  implied contract null and void. (See id. at 8.)

7  The background of this case has already has been set forth in detail. The Court notes
8  that the sequence of events is important regarding the creation and transfer of the implied
9  nonexclusive irrevocable license to use the residential home plans. The creation and
10 conveyance of the implied nonexclusive irrevocable license occurred when Felten/Merit
11 distributed the plans to Arboleda Ranch with the intent that Arboleda Ranch would use the
12 plans to obtain approvals, building permits, and build the residential home development.
13 Upon default, the loan documents established that the license to use the plans to complete the
14 project passed first to NBA. During foreclosure proceedings, following the Trustee Sale,
15 NBA sold the license to Arboleda Ranch 31. After NBA had already sold the license to
16 Arboleda Ranch 31, NBA entered into the settlement agreement between itself, Arboleda
17 Ranch, Merit and the individual guarantors. Arboleda Ranch 31 was not, and had no reason
18 to be, involved in the settlement agreement. Thus, the implied nonexclusive irrevocable
19 license was already in the hands of Arboleda Ranch 31 prior to execution of the settlement
20 agreement. The settlement agreement had no effect upon Arboleda Ranch 31's ownership
21 of the license. As the record indicates, Arboleda Ranch 31 then sold the license to complete
22 the project to JCH, and JCH, within the scope of its license, completed the residential home
23 project.

24  Merit's Other Contentions

25  Based on the fact that the loan documents did not transfer any copyright interest in the
26 residential plans to NBA, Merit contends that NBA could not convey any copyright interest
27 to a subsequent purchaser, including JCH. (Doc. 38 at 1.) The Court summarily rejects this
28

1   argument. JCH has never argued that it relied upon the loan documents to convey a
2   copyright interest to NBA regarding the residential home plans (Doc. 40 at 1); JCH has
3   argued only that NBA acquired Arboleda Ranch's license to use the residential home plans
4   and that this license was ultimately sold to JCH to complete the residential home project.
5   (Id.)

6   Regarding Merit's other contentions, because the Court has found that JCH met its
7   burden of proving that it had an implied nonexclusive license to use the copyrighted
8   residential home plans to complete the project and because such a license is an affirmative
9   defense to Merit's copyright infringement allegations against JCH, the Court need not discuss
10  or resolve Merit's other arguments that are irrelevant to the disposition of this case: 1)
11  Merit's contention that JCH's reliance upon being granted an express license from Felten is
12  not a valid defense because Felten did not possess the right to unilaterally convey a license
13  to a separate business entity under the specific contract language agreed to between Felten
14  and Merit (Doc. 38 at 1); 2) Merit's contention that JCH's reliance upon being granted an
15  express license from Felten is not a valid defense because when Felten told JCH that it would
16  need Merit's written approval before agreeing to license JCH to use the plans, JCH
17  misrepresented to Felten that Merit's ownership in the copyrighted plans was extinguished
18  in the foreclosure proceedings (Doc. 41 at 10-14); and 3) Merit's allegation that JCH is
19  secondarily liable for contributory infringement and/or secondarily liable for vicarious
20  infringement of Merit's designs (Id. at 9-10).

## CONCLUSION

22  Accordingly, for the reasons set forth above,

23  **IT IS HEREBY ORDERED GRANTING** Defendants' motion for summary judgment
24  and denying Plaintiff's claim that Defendants are liable for copyright infringement. (Doc.
25  33.) The Court will not exercise its discretion to retain supplemental jurisdiction regarding
26  Plaintiff's claims against Defendants for unjust enrichment and tortious interference with
27  contract. The Clerk of the Court shall enter judgment in favor of Defendants and against

1 | Plaintiff.

**IT IS FURTHER ORDERED DENYING** Plaintiff's motion for summary judgment (Doc. 41.)

DATED this 27th day of March, 2012.

Stephen M. McNamee
Senior United States District Judge

- 16 -